Filed 1/31/14  P. v. Gomez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RALPH GOMEZ,<br><br>    Defendant and Appellant. | B244057<br><br>(Los Angeles County<br>Super. Ct. No. BA370794) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Laura F. Priver, Judge.  Affirmed in part, reversed in part and remanded with directions.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Ralph Gomez appeals from a judgment which sentences him to seven years in state prison for transportation of heroin and cocaine base for sale. Gomez challenges various trial court evidentiary rulings, each of which we find meritless. We further find the trial court did not err when it failed to stay the sentence for transportation of cocaine base under Penal Code section 654. However, we find the trial court abused its discretion when it denied Gomez's motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). Accordingly, we conditionally reverse the judgment and remand with directions. The judgment is otherwise affirmed.

## FACTS

Gomez was charged with transportation of heroin (count 1), possession of heroin for sale (count 2), transportation of cocaine base (count 3) and possession of cocaine base for sale (count 4). (Health & Safety Code, §§ 11352, subd. (a), 11351, 11351.5.) It was further alleged that Gomez suffered four prior convictions pursuant to Penal Code section 667.5, subdivision (b) and was previously convicted of possession of narcotics pursuant to Health and Safety Code section 11370.2, subdivision (a). Gomez was also alleged to have suffered a prior strike pursuant to Penal Code sections 1170.12, subdivisions (a) through (d) and section 667, subdivisions (b) through (i).

At trial, the prosecution presented evidence that Gomez was found in possession of black tar heroin and cocaine base. Los Angeles Police Department (LAPD) Detective Arturo Koenig, the supervisor in charge of the Northeast Narcotics division, testified he was in an unmarked car when he noticed a blue Pontiac go through a red light while making a right-hand turn in violation of Vehicle Code section 21453, subdivision (b). Detective Koenig asked for assistance in making a traffic stop and notified his team that he was going to follow the car. He followed the car into a supermarket parking lot. The car stopped and Detective Koenig identified Gomez as the driver. Detective Koenig had not seen Gomez before nor had he had any contact with him.

As Detective Koenig continued to observe Gomez, he noticed a Hispanic male walking towards Gomez's car. The man, who was identified at trial as Hermino Ramirez, had a short conversation with Gomez through the car window. Gomez then reached

2

across the seat of his car and opened the passenger door. Ramirez got into the car while taking money from his right front pants pocket.

When the other officers arrived on the scene, Detective Koenig asked them to detain the two men in the car because he believed a possible drug deal was occurring. Detective Koenig had made drug-related arrests in the past in that parking lot because transients would often use the money they received from the nearby recycling center to buy narcotics. Detective Koenig also felt Ramirez acted suspiciously because his head was looking left and right while he walked to Gomez's car and retrieved money from his pocket.

Officers searched Gomez and his car after he told them he was on parole for a prior narcotics conviction, a condition of which was that he voluntarily consent to search and seizure. Detective Victor Cadena searched Gomez's wallet and found a baggie of heroin and $264 inside. A digital scale and $248 was also found in a backpack in the car.

Detective Koenig requested a narcotics sniffing dog to continue the search for hidden narcotics. After circling around the car, the canine indicated something was in the front wheel well. When the officer opened the hood, he found a sock containing a plastic blue M&M container with 40 balloons of heroin and a bag of cocaine. Gomez was arrested on suspicion of transportation of narcotics and possession of narcotics for sale. His car was impounded.

Gomez represented himself at trial with standby counsel present. His defense was that Detective Koenig and the other police officers planted the narcotics in the car in retaliation for a prior arrest that resulted in a dismissal of the charges. In the previous arrest, Gomez was found with over 70 bags of heroin and $900. Gomez recovered the money that had been seized plus interest. Under Gomez's theory, the officers felt he had evaded justice and planted some of the heroin from the previous arrest on him.

Gomez testified that he had just come from lunch at a nearby McDonald's and was planning to drop off cans at the recycling center. He parked next to a tree near the recycling center and waited until his favorite Fleetwood Mac song finished. Ramirez, whom Gomez knew from the neighborhood, came up to the car and got in to ask him to

3

drive him and his family home. At that point, Gomez noticed that Detective Koenig was parked to his left and watching him. Gomez said, "Oh, it's him again." Gomez testified that about a month prior to this incident, he had two altercations with Detective Koenig at the nearby McDonald's.

Gomez was ordered out of the car by the officers. When Officer Gonzalez pulled a bindle out of Gomez's wallet, he had a smile on his face; Gomez then realized that he planted the evidence because "they couldn't get me no other way . . ." Gomez was escorted to the back of the police car with Ramirez. He noticed Detective Koenig conducted a search of his car, pulling out panels and the dash board.

The canine handler then put the dog in the front and back seat of the car and walked him around the car. The dog handler threw a towel about 30 feet away and the dog fetched the towel three times. During the last round of fetch, Detective Koenig and Officer Zachary Jordan opened the hood while out of Gomez's line of vision. When Gomez saw them again, they had a white sock and he realized they had planted those drugs as well.

Gomez admitted he was a heroin addict, but testified he had been very careful about using drugs because he kept running into Detective Koenig and Officer Jordan. He denied having drugs in his wallet or under the hood of his car that day.

Gomez also presented testimony from Dr. Richard Polsky, an expert on animal behavior including drug detecting dogs. Polsky opined that a dog handler can intentionally or unintentionally provide cues to the dog through the manner in which he or she handles the leash. He also testified that drug detection dogs can make mistakes.

The jury returned a guilty verdict as to all four counts. The prior conviction and prior prison term allegations were found true by the court in a separate bench trial. The court denied a motion for new trial. Gomez was sentenced to seven years in state prison, representing the midterm of four years for transportation of heroin (count 1) plus three years for enhancement for the prior narcotics conviction. The trial court also sentenced Gomez to the midterm of four years for transportation of cocaine base (count 3) to be served concurrently. It stayed the prison terms for the remaining counts pursuant to

4

Penal Code section 654 and struck the prior prison term enhancements. Gomez timely appealed.

**DISCUSSION**

**I.      *Pitchess* Motion**

Gomez contends the trial court erred in denying his *Pitchess* motion. We agree.

**A. The Proceedings Below**

Gomez filed a *Pitchess* motion for discovery of the personnel files of the officers involved in his arrest—Koenig, Jordan, Gonzalez, Cadena, Thompson, and Bedolla. He sought "[a]ll complaints from any and all sources relating to acts of aggressive behavior, violence, excessive force, or attempted violence or excessive, racial bias, gender bias, ethnic bias, sexual orientation bias, coercive conduct, violation of constitutional rights, fabrication of charges[,] fabrication of evidence, fabrication of reasonable suspicion and/or probable cause illegal search/seizure; false arrest, perjury[,] dishonesty, writing of false police reports[,] writing of false police reports to cover up the use of excessive force[,] planting of evidence, false or misleading internal reports including [] but not limited to false overtime or medical reports, and any other evidence of misconduct amounting to moral turpitude within the meaning of *People v. Wheeler* (1992) 4 Cal.4th 284 [(*Wheeler*)]."

In support of his motion, Gomez submitted his own signed declaration under penalty of perjury. He attested that he was arrested in 2009 by Officer Jordan on similar drug-related charges and those charges were later dismissed. After the dismissal, Gomez attempted to retrieve his personal property, which had been booked into evidence, from the Northeast Los Angeles police station. Jordan advised him he needed a court order to retrieve his property. When he returned with the order, Jordan advised Gomez the property had been destroyed. Gomez then asked to speak to a supervisor and was required to fax the court order over to the supervisor three times before she informed him that his property had been destroyed. Gomez advised the supervisor that he would begin civil litigation.

Two months later, Gomez was arrested in this case. He was driving the same car he drove when previously arrested. Although Gomez admits he is a heroin addict, he realized he "had just recently been released on similar charges and [he] was extremely cautious in [his] travels in the same car as prior arrest and . . . was very concerned about retribution due to [the] confrontation with officer 'Jordan and Lt. Jane Doe.' "

Gomez accused the officers of acting to fabricate evidence and commit perjury at the preliminary hearing. Gomez said Officer Jordan lied when he denied having any prior contact with him. Gomez heard Jordan tell the other officers, "That's him." He questioned the truthfulness of Detective Koenig's testimony that he called for a narcotics investigation while he was following Gomez's car after a mere traffic infraction. Gomez also denied taking the route Officer Koenig recounted. Gomez said Officer Cadena was not the officer who removed Gomez's wallet from his pocket nor was Officer Carlos Bedolla the one who recovered the sock.

At the hearing, Gomez argued that the officers conspired to use the heroin and scale seized from him during the 2009 arrest to implicate him in this arrest. The trial court denied Gomez' request to allow him to add these facts to his declaration.

The trial court ruled that Gomez did not articulate a specific and plausible factual scenario to justify an in-camera review of the officer personnel records for possible discovery. Gomez's two subsequent motions for reconsideration were denied.

## B. Gomez Demonstrated Good Cause for an In-Camera Hearing

A criminal defendant is entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer accused of misconduct against the defendant upon a showing of good cause. (Evid. Code, § 1043, subd. (b)(3).) Good cause for discovery exists when the defendant shows both "'materiality' to the subject matter of the pending litigation and a 'reasonable belief' that the agency has the type of information sought." (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 84.) A defendant is entitled to discover relevant information under *Pitchess* even in the absence of any judicial determination that the potential defense is credible or persuasive. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1016, 1026 (*Warrick*).)

6

"If the defendant establishes good cause, the court must review the requested records in camera to determine what information, if any, should be disclosed. [Citation.] Subject to certain statutory exceptions and limitations [citation], 'the trial court should then disclose to the defendant "such information [that] is relevant to the subject matter involved in the pending litigation." ' [Citations.]" (*People v. Gaines* (2009) 46 Cal.4th 172, 179.) A showing of good cause is measured by "relatively relaxed standards" that serve to " 'insure the production' " for trial court review of " 'all potentially relevant documents.' " (*Warrick, supra,* at p. 1016.) We review the trial court's ruling on a motion to discover personnel records for abuse of discretion. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 827.)

In *Warrick*, the California Supreme Court held that good cause may be established if the allegations are specific, factual, and unambiguous. (*Warrick, supra,* at pp. 1016, 1025-1026.) Plausibility is satisfied if a defendant "demonstrate[s] that the scenario of alleged officer misconduct could or might have occurred"; the allegations need not be "reasonably probable or apparently credible." (*Ibid.*) Moreover, "a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges. A defendant must also show how the information sought could lead to or be evidence potentially admissible at trial." (*Id*. at p. 1026.) "The trial court does not determine whether a defendant's version of events, with or without corroborating collateral evidence, is persuasive — a task . . . tantamount to determining whether the defendant is probably innocent or probably guilty." (*Ibid*.)

We find Gomez met this relatively low threshold by presenting a plausible factual scenario that supports his defense claim of retribution and false evidence. Gomez explained why he was targeted by the police, how the officers could have planted the drugs, and where the officers got the drugs and paraphernalia to plant on him. He accounted for not only his actions, but also for Ramirez's and the police officers' actions. Whether Gomez's version of events is credible is irrelevant; it is internally consistent and supports a defense to the charges. We conclude the trial court abused its

7

discretion by denying the *Pitchess* motion without conducting an in camera review of the records requested.

People v. Thompson (2006) 141 Cal.App.4th 1312 (*Thompson*), relied upon by the Attorney General, is distinguishable. In that case, the police reported the defendant sold narcotics to an undercover officer as several other police officers watched the transaction. (*Id*. at pp. 1315, 1317.) In his *Pitchess* motion, the defendant denied involvement in the narcotics transaction and asserted the police arrested him because he was in an area where the police were making other arrests for drug sales. (*Id*. at p. 1317.) The Court of Appeal found the defendant did not show good cause for discovery of police personnel records regarding dishonesty, planting evidence and other misconduct because the factual scenario he presented did not explain why he was in an area where drugs were being sold or what he was doing prior to his arrest which led to his "being singled out by the police." (*Id*. at pp. 1317-1318.) Unlike Gomez, the defendant in *Thompson* failed to "state a nonculpable explanation for his presence in an area where drugs were being sold, sufficiently present a factual basis for being singled out by the police, or assert any 'mishandling of the situation' prior to his detention and arrest. Counsel's declaration simply denied the elements of the offense charged." (*Id.* at p. 1317.)

In reaching this conclusion, we note that Gomez has *not* established good cause to discover *all* of the documents he requests. His request was far too overbroad. For example, his allegation that the officers planted evidence does not support discovery of complaints for excessive violence. There was no contention that the officers used excessive force during the arrest. Contrary to the Attorney General's contention, however, this is not fatal to Gomez's request. In *Warrick,* the California Supreme Court was faced with a similarly overbroad *Pitchess* motion. During the course of its analysis, the high court narrowed the subjects of discovery solely to those which correlated with the allegations in the defendant's motion. (*Warrick, supra,* 35 Cal.4th at p. 1027; see also *People v. Jackson* (1996) 13 Cal.4th 1164, 1220 [overbroad discovery request is properly narrowed by the trial court to misconduct similar to that alleged].) We do so as well.

8

According to Gomez's declaration, Detective Koenig fabricated a traffic violation. During the detention, Officer Gonzalez, not Officer Cadena, removed his wallet and planted the bindle of heroin in it. Detective Koenig and Officer Jordan then planted the M&M container in his car and Officer Thompson "almost simultaneously" planted the digital scale in the backpack in the trunk of his car. Officers Gonzalez and Bedolla lied at the preliminary hearing. We thus find Gomez is entitled to an in camera review by the trial court of Detective Koenig and Officers Jordan, Gonzalez and Thompson's personnel records relating to fabrication of evidence, perjury, and planting of evidence only. The trial court should also review Detective Koenig's records for complaints related to fabrication of reasonable suspicion and probable cause. As to Officers Cadena and Bedolla, there is no indication from Gomez that they planted any evidence, only that they committed perjury. Accordingly, Gomez is entitled an in camera review of their personnel records relating to perjury only.

The remaining categories sought in Gomez's *Pitchess* motion are "completely untethered either to the factual scenario or to the proposed defenses outlined in [the] declaration[,]" (*Warrick, supra*, 35 Cal.4th at p. 1022), including the request for discovery of conduct constituting moral turpitude. Although the honesty of the officers is at issue here, Gomez's request for "any other evidence of misconduct amounting to moral turpitude within the meaning of [*Wheeler, supra,* 4 Cal.4th 284]"[1] was overbroad. This is because *Wheeler* does not eliminate the good cause requirement of the Evidence Code, and "only documentation of past officer misconduct which is *similar* to the misconduct alleged by defendant in the pending litigation is relevant and therefore subject to discovery." (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1021, 1024 [seeking all *Wheeler* evidence "would effectively abrogate the good cause requirement . . . by permitting fishing expeditions into the arresting officers' personnel records in virtually every criminal case"].)

---

[1]    In *Wheeler, supra,* 4 Cal.4th 284, the California Supreme Court held that nonfelony conduct involving moral turpitude is admissible to impeach a criminal witness.

9

The remedy for a *Pitchess* error is a conditional and remand of the case to the trial court to conduct an in camera hearing. (*People v. Gaines, supra,* 46 Cal.4th 172, 180.) If, after reviewing the confidential material in chambers, it is found the personnel records contain no relevant information, the court is to reinstate the judgment. (*Id*. at p. 181.) If, however, it is found on remand discoverable information exists and should have been disclosed, the trial court must order disclosure of that information, allow the defendant an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed. (*Ibid*.)

## II. *Brady[2]* Motion

Gomez next contends the trial court abused its discretion when it failed to rule on his *Brady* motion, which sought information related to the disposition of the property seized during his arrest in 2009. We disagree.

"'Pursuant to *Brady, supra*, 373 U.S. 83, the prosecution must disclose material exculpatory evidence whether the defendant makes a specific request (*id*. at p. 87 . . . ), a general request, or none at all . . .' (*In re Brown* (1998) 17 Cal.4th 873, 879.) 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.] Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review. [Citation.]' (Citations.)" (*People v. Verdugo* (2010) 50 Cal.4th 263, 279.)

The record is less than clear and somewhat incomplete on this issue, but as best we can discern, it shows Gomez made multiple unsuccessful attempts to discover the disposition records of the items seized during his arrest in 2009. Prior to the preliminary

---

**2** *Brady v. Maryland* (1963) 373 U.S. 83.

hearing, Gomez served a subpoena duces tecum on the custodian of records for the LAPD seeking "[r]ecord [sic] of destruction of 2 cell phones and 1 digital scale which was booked into evidence on February 25, 2009 DR. #09 11 07556 and which transferred to Narcotics group at Central Division from Northeast LAPD division property room. Request copy of property disposition form 10.06.00 and any item detail summary report that may have been filled out for property disposal or destruction. Copy of records by property disposition coordinator authorizing such destruction of above property." The City Attorney moved to quash the subpoena.[3] Gomez served a second subpoena duces tecum to the LAPD, which the City Attorney again moved to quash. That motion was granted.

Next, Gomez filed a "motion for discovery" seeking various daily worksheets and daily reports; it did not request information regarding the seized items. Gomez repeated his request for these worksheets and reports in a "motion to compel constitutionally mandated discovery." Both motions were denied by Judge Lisa Lench. Gomez served the LAPD with three subpoenas duces tecum, including one requesting "[a]ll APINS record for property booked into evidence under DR#09-11-07556 per LAPM Manual Sec. 501.10. and legible copy of long term sign out for above property." At the hearing on the motion to quash, Judge Patricia Schnegg quashed all three subpoenas and admonished Gomez not to direct any more subpoenas to the LAPD or his pro per status would be revoked.

Gomez then filed a "motion for constitutional mandated discovery *Brady* Material" requesting, among other things, documents relating to the disposition of the property seized during his 2009 arrest. In a hearing before Judge George G. Lomeli[4]

---

**3**    There is no indication from the record whether the court ruled on the motion. In any case, the requested records were not produced.

**4**    The reporter's transcript indicates Judge Schnegg presided over the hearing in Department 100. However, comments made during the hearing and subsequently by Judge Ryan suggest Judge Lomeli presided, not Judge Schnegg. Gomez does not dispute

11

regarding the parties' readiness for trial, Gomez requested "some brief discovery." Judge Lomeli questioned the prosecutor about Gomez's request.

"The Court:  Has all discovery been turned over?

[The Prosecutor]:  I have received no discovery from Mr. Gomez.  All the discovery that I have, I have turned over to him.

The Court:  Okay.

The Defendant:  But I'm not asking for the discovery that she has submitted.  The *Brady* material evidence that may be favorable.

The Court:  Is there any *Brady* material?

[The Prosecutor]:  No, your honor, and I have an ongoing duty to turn that over, and whatever I have, I've turned over.

The Defendant:  Your honor, I gave the people's representative on the 22nd a copy of the *Brady* material.

The Court:  I have that copy here as well, sir, but if they represent to this court that there is no existing *Brady* material, the record is what it is.

The Defendant:  But what I'm asking for, your honor, is the work assignment sheet, vehicle assignment sheets and the watch commander's logs, which I gave her a copy.  I have copies here as exhibits, and I gave—attached them to the motion.  That's what I'm asking for.  There's nine officers and they all had call—had communications.

The Court:  How is that relevant, sir?

The Defendant:  That's relevant because who called in what and at what time and for what so I can identify the people.

The Court:  I'm going to declare you ready, sir.  Matter is sent to Department 130.  Judge Ryan."

In Department 130 later that day, the prosecutor confirmed to Judge William C. Ryan that there was no additional *Brady* information required to be disclosed.  Gomez

this, merely noting that the record is unclear which judge was sitting in Department 100 on December 2, 2011

asserted that Judge Lomeli never ruled on his *Brady* motion. Judge Ryan noted, "Well, it's my understanding that Judge Lomeli, because I spoke to him by phone a moment ago, said that [the prosecutor] had represented that everything they had was turned over. They don't have anything else." Gomez responded that the motion is "not for things that they have" and listed the reports and logs that he had sought previously. Later, Judge Ryan discussed the issue with Judge Lench and reported to the parties.

> "The Court: Okay. Now, the motion for *Brady,* according to Judge [Lench] that was discussed in the trial court, and they said they don't have anything else to turn over.
>
> The Defendant: Well, I hadn't filed it then at that time because I didn't have copies to file it.
>
> The Court: It says you showed it to him. I talked to Judge Lench so that's been dealt with. There's no additional information.
>
> The Defendant: There was no ruling on that at that time, your honor.
>
> [The prosecutor]: Well, that's what she told me it was, and it's been handled.
>
> The Court: Right. You have no additional information."

The court minutes for that day indicate the motion to compel discovery was previously ruled upon.

Gomez argues Judge Ryan failed to rule on his motion because he believed the matter had already been decided by Judge Lench. According to Gomez, Judge Ryan's failure to rule on the motion is an abuse of discretion and the proper remedy on appeal is remand with directions for the trial court to exercise its discretion on his discovery motion. (*See People v. Orabuena* (2004) 116 Cal.App.4th 84, 99 [when trial court fails to exercise discretion because it believed it lacked authority to do so, the appropriate relief on appeal is to remand so the trial court may exercise its discretion] and *People v. Massie* (1967) 66 Cal.2d 899, 917-918 [trial court erred when it refused to exercise its discretion on defendant's motion for separate trial]; *Kahn v. Lasorda's Dugout, Inc.* (2003) 109 Cal.App.4th 1118.)

13

Because we conclude Judge Lomeli impliedly denied the *Brady* motion, we need not reach the issue of whether Judge Ryan abused his discretion by failing to rule on the issue. The record shows Gomez sought additional time from Judge Lomeli for "some brief discovery" and explained that he was "not asking for the discovery that [the prosecutor] has submitted." Instead, he was asking for "the work assignment sheet, vehicle assignment sheets and the watch commander's logs[,]" which were relevant to "identify the people." It is apparent Judge Lomeli did not agree with Gomez regarding the relevance of his *Brady* request when he refused to grant him the additional time, reminding him that "this case is almost a year old." Judge Lomeli concluded that there was no additional *Brady* material to be disclosed, based on the prosecutor's statement. He also apparently explained this to Judge Ryan later in the day. Therefore, Judge Ryan properly denied Gomez's renewed motion for the discovery and there was no failure to rule on Gomez's *Brady* motion.

## III. Evidentiary Rulings

Gomez further argues the judgment must be reversed because the trial court excluded certain pieces of evidence. In addition to the facts surrounding his 2009 arrest and the subsequent dismissal of the charges, Gomez also "wanted to show both his diligent efforts to recover his property, and the deliberate withholding of the administrative records of the disposition of the property [seized in the 2009 arrest.]" We find no error.

Gomez testified the evidence was planted on him. However, he challenges the court's orders relating to (1) a motion in limine to admit evidence of the prior arrest, the subsequent dismissal and his attempts to recover his property; (2) trial testimony regarding the prior arrest; (3) testimony from Hank Cousine regarding Detective Koenig's arrest of him;(4) the parole search of Gomez's residence; (5) expert testimony regarding police procedure; and (6) a new trial motion.

We review a trial court's ruling on the admissibility of the evidence for abuse of discretion. (*People v. Riggs* (2008) 44 Cal.4th 248, 289.)

14

## A.  Evidence Regarding Previous Arrest

At a March 27, 2012 pre-trial hearing, Gomez presented a motion in limine to admit evidence purporting to support his defense theory of retaliation and false evidence. The trial court asked Gomez to clarify what evidence he sought to admit.  Gomez explained he wanted to present evidence that:  he was detained in the parking lot of his motel in 2009; Jordan was part of the team that searched his motel room and found 73 balloons of heroin along with $900, two cell phones and a digital scale; after his case was dismissed, he had a confrontation with Jordan when he sought to recover his money and property; although he eventually recovered his money plus interest, Gomez was advised his remaining property, including the cell phones and the scale, had been destroyed; he made diligent efforts to recover those items and to discover, in this case, the disposition records showing the destruction of his property; he filed a civil suit in federal court against Jordan and other officers.  Because Jordan was also a member of the search team at the time of his arrest in the instant matter, Gomez sought to link him to the 2009 arrest to show this prosecution was merely conducted in retaliation.

The prosecutor argued that Gomez's arrest in 2009 was irrelevant to the case here. The officers identified by Gomez who were involved in both incidents were either in the narcotics unit or the special problems unit, and thus would be involved with any investigation in that area.  The prosecutor stated that Jordan, in particular, was called in as backup to conduct the search in 2009 after Gomez was arrested.  He did not meet Gomez or know who Gomez was.  He arrived on scene after Gomez had already been taken into custody.  In 2010, Jordan was not the arresting officer but, again, was called in afterwards to lead the investigation and book the evidence, although he did see Gomez at this arrest.  The prosecutor further specified that Jordan had nothing to do with the return of the money, including how it was returned or what happened to it.  She also questioned Jordon regarding whether he recognized Gomez.  Jordon responded that he did not remember Gomez and did not realize it was him at the time of the 2010 arrest.

The trial court denied Gomez's request to present evidence regarding what happened to the property following the 2009 arrest. It found that the evidence would prejudice Gomez and "[c]ompared to its probative value, I also think that there is not a sufficient link to show that the property destruction or your inability to get the property back can be attributed to the officers in this case if you want to make it look [] dishonest and untruthful because of that previous success you had on the other case, but you haven't shown the court a sufficient link in order to do that."

At trial, Gomez twice renewed his request to question Jordan regarding the prior arrest and the seizure of cash and heroin. Gomez asserted that he had witnesses at the scene that would testify that Jordan said, "He got away last time but we got 'em this time." The trial court denied his request under Evidence Code section 352, finding that it would consume jury time and was purely speculative. The trial court again explained, "There is absolutely no evidence this officer had anything to do with the destruction of the property [or] that he even knew you or in his own head connected you to that other arrest and in fact I think the evidence is the opposite. He doesn't recognize you from any prior contact."

Gomez attempted to testify about the 2009 arrest, his attempt to recover his property, and the civil suit he had filed against the officers in federal court. In particular, Gomez testified that at the time of the detention, Koenig said to him, "You thought you got away last time." That testimony was stricken upon the prosecutor's motion. The prosecutor's objections to each of these statements were also sustained by the trial court.

In a related motion, the prosecutor sought to exclude evidence that the prior case against Gomez was dismissed. The court agreed that it was prejudicial to Gomez and irrelevant to the present case. The trial court also disallowed evidence regarding Jordan's participation in the prior arrest because it was irrelevant to the present case. Later, the trial court sustained the prosecution's objections to Gomez's examination of the arresting officers, Koenig, Thompson and Bedolla. Objections were sustained when Gomez asked Koenig whether he had ever been sued or disciplined for misconduct. The prosecutor's objections were further sustained when Gomez asked Thompson if he met Gomez at the

16

police station in 2009 or whether Thompson was aware Gomez was involved with drugs. Further objections were sustained when Gomez asked Bedolla whether he had any information about Gomez prior to this arrest and whether it was unusual to call in narcotics officers for a traffic violation.

At closing, the prosecutor argued that Gomez had failed to convincingly present evidence that the drugs were planted. She commented, "There is nothing so special or spectacular about Mr. Gomez that's going to make them waste all of their resources[,] at least 7 officers." Gomez argues on appeal that the trial court's rulings allowed the prosecutor to emphasize the holes in his defense and deprived him of the right to present a full defense.

We find no abuse of discretion in the trial court's rulings on the motion in limine or on the evidentiary objections at trial. Time and time again, Gomez was unable to show how the evidence he proferred would be relevant to the matter at hand. In particular, evidence of the 2009 arrest and its subsequent dismissal was irrelevant to the current arrest since Gomez was unable to link the officers of the 2009 arrest with the 2010 arrest in any meaningful way. Although Jordan was involved in both incidents, he never even saw Gomez in 2009, because Gomez had already been taken into custody when he arrived on the scene. Moreover, there was no evidence that Koenig, who initiated the detention in 2010, was involved in the 2009 arrest. A defendant must show something more than that the arresting officers were the same as the ones in a previous arrest, particularly when the arrests were close in time, in the same area and involved the same illegal conduct. Neither was Gomez able to link the arresting officers to the destruction of his property. Gomez made no showing that any of the officers participated in the disposition of the seized property.

*People v. Minifie* (1996) 13 Cal.4th 1055, on which Gomez relies, is distinguishable. There, the defendant claimed he acted in self-defense, and he offered evidence of third-party threats and the violent reputation of victim's friends and family to support the defense. The trial court excluded the proffered evidence. The Supreme Court found the proffered evidence to be relevant to the defendant's self-defense claim. (*Id*. at

17

pp. 1061-1062.)  As addressed above, the evidence Gomez sought to admit was not relevant.  Thus, the trial court did not err when it excluded irrelevant evidence.

Additionally, any nominal relevance of the evidence was outweighed by the danger of undue prejudice, confusion of issues and consumption of time.  We find the trial court reasonably concluded that if evidence of the 2009 arrest was admitted, there was a probability that the jurors would have used it for an illegitimate purpose — to infer that Gomez deserved to be found guilty because he had been arrested for possession of 73 bags of heroin in 2009, but faced no consequences for his actions.  Evidence may be excluded as unduly prejudicial when it is of such nature as to motivate jurors to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish.  (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)  Moreover, the jury likely would have been spent undue time focusing on the facts of the 2009 arrest and why the case was dismissed rather than on the facts of this case.  Further, evidence of Gomez's attempts to recover the seized property or discover the disposition records from the LAPD would only have served to confuse the jury and waste its time.  Undue time would have been consumed focusing on LAPD administrative procedures and  record keeping, as well as the rules surrounding discovery in criminal cases.  The trial court properly precluded Gomez from admitting this evidence.

### B.  Testimony of Hank Cousine

Gomez next challenges the trial court's exclusion of testimony by Hank Cousine, a former LAPD officer who had previously accused Detective Koenig of misconduct.  Gomez assured the trial court that Cousine had personal knowledge that Detective Koenig planted drugs on a prior occasion.  At a 402 hearing, Cousine testified that Koenig and another officer pulled him over when he was off duty in 1996 or 1997.  Detective Koenig accused Cousine of being belligerent and failing to obey instructions.  An internal investigation found Koenig's accusations unfounded.  Cousine subsequently filed a civil suit against Detective Koenig.

The trial court denied ruled the evidence inadmissible pursuant to Evidence Code section 352, finding Cousine's testimony had nothing to do with planting drugs. We find no abuse of discretion. Cousine's testimony was irrelevant, the incident was remote in time, and involved conduct unrelated to planting evidence. Further, its nominal probative value was far outweighed by undue consumption of jury time and confusion of issues.

## C. Parole Search

Gomez next contends the trial court erred by failing to allow evidence about the parole search of his home after his arrest. In particular, Gomez claims he should have been able to admit evidence that the officers searched his home for three hours, used a battering ram, handcuffed his nephew and threatened him into making a statement. Further, Gomez sought to admit that the search was not mentioned in the police report. According to Gomez, it "goes to the credibility of these officers as a material omission." Again, we find no abuse of discretion.

The prosecutor did not admit any of the evidence seized from the search and sought to exclude evidence of the search. The trial court allowed Gomez to question the officers about whether a search was conducted and what, if anything, was found. However, he refused to allow any questions regarding the other details of the search such as use of the battering ram and handcuffing Gomez's nephew.

The trial court properly limited the testimony on this issue. Gomez does not explain why the officers' use of a battering ram or handcuffing his nephew was relevant to his defense of planting evidence, particularly when no evidence was found at the residence. We also fail to see the connection between the officers' failure to include details of the search in the police report and the defense of retaliation or fabrication of evidence.

## D. Expert Testimony

Believing there was possible misconduct in the way the detention was conducted, Gomez sought to present testimony from an expert on police conduct. Gomez advised the trial court that the expert would testify that he had 30 years of law enforcement experience and would opine that Gomez's detention was a tactical investigation, it was

improperly conducted, and that omitting the parole search from the arrest report was against policy and cause for finding misconduct. Based on this offer of proof, the trial court denied Gomez's request to call the expert.

Gomez contends that the trial court erred in excluding the police expert's testimony. We disagree. Gomez failed to specify on what basis the expert could opine that his detention was not a random incident, but a "tactical investigation." Gomez failed to explain how the expert's testimony would support his defense theory that the officers planted the evidence. Gomez also failed to link the purported misconduct of omitting facts of the search from the police report with the misconduct of planting drugs on a suspect. The trial court did not abuse its discretion in excluding the expert's testimony under Evidence Code section 352. The proposed testimony had little relevance to the issues raised at trial and posed a high risk of confusing the jury and consuming an undue amount of the jury's time.

### E. Motion for New Trial

After the jury returned its verdict, Gomez filed a motion for new trial, listing 19 separate errors made by the trial court. The trial court denied the motion. On appeal, Gomez asserts the following errors by the trial court deprived him of his fundamental right to present a defense: "The court's pretrial rulings excluding defense evidence; denial of a requested pinpoint instruction on defense theory; sustaining the prosecutor's relevance objections; deprivation of the opportunity to cross-examine Officer Jordan on the 2009 events; deprivation of the opportunity to cross-examine Detective Koenig and to present a witness regarding the detective's past discipline; denial of requests to cross-examine Detective Koenig about the search of appellant's residence; and exclusion of opinion evidence from appellant's police procedure expert." These purported errors have been addressed above. We find none of these challenged rulings to be abuses of discretion.[5] As a result, the denial of the motion for new trial is not an abuse of

---

[5] Gomez also asserts that the trial court accepted the prosecutor's misrepresentation of "facts" in reaching its decision on the motion for new trial. Gomez contends, "To the extent that the court relied on the prosecutor's misrepresentations of fact, the court's

discretion. (*People v. Navarette* (2003) 30 Cal.4th 458, 526 [ruling on new trial motions reviewed for abuse of discretion].)

## IV. Request for Judicial Notice

At trial, Gomez asked the officer handling the canine whether she was familiar with the type of M&M container found in his car and whether she considered the container to be "air tight." She responded, "I've never done a scientific experiment to see if air comes out of a container like that but to make an assumption I'm going to assume that air can get out of a flimsy piece of plastic container." She further testified that she believed a canine could detect narcotics in the M&M container "because he did." During a subsequent discussion outside the presence of the jury regarding the scope of testimony from Gomez's canine expert, Gomez indicated he would elicit testimony regarding whether a canine would alert to an air tight container. When the trial court warned Gomez that there was no evidence the container was air tight, he stated that Clarke had testified that water does not come out of it so he believed it was air tight and water tight. When Gomez asked the canine expert if a drug detection dog could detect a controlled substance placed in an air tight container, the expert testified it would depend on a wide range of variables.

During Gomez's cross-examination, the prosecutor asked him:

"Q    Have you ever poured water in that container, closed the top and see if any water comes out of that?

A    Not in that or any one of those containers.

Q    Did you previously say in court today that you tested that container to see if it's air tight?

A    If I did I misspoke but I assume it's air tight just by the way it snaps.

---

factual findings are not supported by the record." The misrepresentations of which Gomez complains are merely descriptions of the proceedings at trial. For example, the prosecutor misstated that Gomez admitted to the jury during opening statements that he was a drug addict when, in fact, he made those statements during closing arguments. Gomez fails to explain how these misrepresentations, if they are such, justify a new trial.

21

[The prosecutor]: Ask the court to take judicial notice earlier today Mr. Gomez said he tested that container, poured water into it, closed the top and turned it over and no water spilled out.

The court: All right."

Gomez now argues that the trial court erred in taking judicial notice that he experimented with the M&M container. Because Gomez failed to object to the prosecutor's request for judicial notice, he has forfeited the issue on appeal. (Evid. Code, § 353, subd. (a).) Gomez acknowledges the forfeiture but urges this Court to excuse his failure to object. We decline to do so.

## V.  Sentencing

Gomez contends that the trial court erred when it sentenced him to separate prison terms for count 1 (transportation of heroin) and for count 3 (transportation of cocaine base) in violation of Penal Code section 654's prohibition against multiple punishment for the same conduct. We find no sentencing error.

Section 654 bars multiple punishment where the convictions arise out of an indivisible transaction and have a single intent and objective. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; see also *People v. Latimer* (1993) 5 Cal.4th 1203, 1216.) Gomez contends the proper procedure is to stay execution of sentence on one of the offenses. (*People v. Pearson* (1986) 42 Cal.3d 351, 359-361.) Gomez relies on the Supreme Court's holding in *In re Adams* (1975) 14 Cal.3d 629, 635-636 (*Adams*). There, the high court struck down multiple punishment for a defendant who had been caught transporting several types of contraband in his vehicle. Reasoning that the defendant entertained only the single objective of delivering the narcotics to a cohort, the court found an "indivisible course of conduct . . . which . . . results in the commission of a single punishable offense." (*Ibid.*) Gomez argues that *Adams* requires a finding that he harbored a single intent and objective in this case – to sell illegal drugs, no matter how many individual types of contraband he possessed for this purpose. We disagree.

22

The conduct for which Gomez was convicted is more analogous to that described in *People v. Monarrez* (1998) 66 Cal.App.4th 710 (*Monarrez*). There, the defendant was convicted of possession of heroin for sale, possession of cocaine for sale, and receiving stolen property. On appeal, the defendant asserted that the trial court erred by imposing separate sentences for the drug offenses in violation of Penal Code section 654. Relying on *People v. Barger* (1974) 40 Cal.App.3d 662, 672 (*Barger*), the appellate court concluded section 654 did not prevent multiple convictions for the same conduct, only multiple punishment. In *Barger*, the defendant received separate punishments for possessing cocaine, Secobarbital, and marijuana, as well as for possessing heroin for sale. Rejecting defendant's contention that he had only the single objective of possessing drugs to trade for automatic weapons, the court noted that California courts had "uniformly" held that Penal Code section 654 "does not preclude multiple punishment for simultaneous possession of various narcotic drugs." (*Ibid*.)

The *Monarrez* court held that *Adams* did not compel a rejection of *Barger*, observing that *Adams* cited to *Barger* without disapproval. The court explained, "It was reasonable for the court in *Adams* to find a single illegal intent where the defendant's sole act was to move a large quantity of drugs from one place to another. Furthermore, in *Adams* the evidence showed that defendant intended to deliver all of the drugs to a single recipient. *Adams* simply does not deal with the case in which the defendant has been found to possess more than one particular illegal drug, or possess it with the intent to sell to a presumptively large number of buyers." (*Monarrez,* at p. 714.)

The *Monarrez* court found that the trial court did not commit error by imposing separate sentences for the drug offenses. The court stated that section 654 did not preclude multiple punishment for simultaneous possession of various narcotic drugs that were seized during a single search. The court concluded, "The evidence supported a finding that defendant had been engaged in multiple sales and intended to make multiple sales of the narcotics which he possessed. The narcotics are separately classified and regulated by the Legislature; they have different effects and pose different hazards to society. The punishment imposed here was entirely fair." (*Monarrez,* at p. 715.)

23

Likewise, the evidence here supports a finding that Gomez transported heroin and cocaine with the intent to make multiple sales. Koenig testified that the single bag of heroin found in Gomez's wallet indicated that "he had one ready to go" to sell to Ramirez while the hidden cache of drugs was intended for other sales. Koenig believed that the digital scale recovered from Gomez's backpack would likely be used to weigh cocaine out for buyers because cocaine users wanted to verify the amount of drugs they were buying. "Furthermore, different drugs are directed at different buyers--in some cases, at different classes of buyers--and represent different dangers to society. It would be absurd to hold that a criminal who deals in one contraband substance can expand the scope of his inventory without facing additional consequences." (*People v. Menius* (1994) 25 Cal.App.4th 1290, 1297.) Under the reasoning in *Monarrez,* the trial court did not err when it failed to stay the sentence on count 3 under Penal Code section 654.

## VI. Motion to Suppress Evidence

Prior to trial, Gomez moved to suppress the narcotics discovered during his detention, arguing that his detention was illegal under the Fourth Amendment as the circumstances did not justify a detention. In a supplemental opening brief, Gomez reiterates that argument, and contends the trial court erred in denying the motion to suppress. We find the motion was properly denied.

A police officer is permitted to initiate an investigative stop or detention of an individual without violating the Fourth Amendment when the officer has a reasonable suspicion that criminal activity may occur. (See *Terry v. Ohio* (1968) 392 U.S. 1, 30; and see, e.g., *People v. Conway* (1994) 25 Cal.App.4th 385, 388.) "In order to justify an investigative stop or detention in a case such as this, the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to a crime has taken place, is occurring, or is about to occur; and (2) the person he intends to stop or detain is involved in that activity." (*People v. Jones* (1991) 228 Cal.App.3d 519, 524 (*Jones*); *People v. Souza* (1994) 9 Cal.4th 224, 230.) Not only must he subjectively entertain such a suspicion, it must be objectively reasonable for him to do so. (*Ibid.*) A court is allowed to employy

24

commonsense judgments and inferences about human behavior to determine whether reasonable suspicion is present. (*People v. Conway, supra*, 25 Cal.App.4th at p. 388; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 146.) In reviewing a trial court's denial of a motion to suppress, "we uphold the trial court's factual findings if they are supported by substantial evidence, but independently review its determination that the search did not violate the Fourth Amendment." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1157.)

Detective Koenig was an 18-year veteran with over 11 years experience in the narcotics unit. He testified that he was driving in an unmarked car when he observed Gomez failing to stop at a red light before he made a right turn. Detective Koenig requested a marked police car assist in conducting a traffic stop. As he waited for the other officers to arrive, Detective Koenig followed Gomez's car to a nearby supermarket parking lot. He considered this parking lot to be a high drug trafficking area because transients often turned in recyclables at the nearby recycling center and used the money they received to buy narcotics. Detective Koenig had previously arrested individuals for drug sales in this area. Detective Koenig parked about 20 feet away and watched Gomez sit in his car for two to three minutes without getting out. He then observed a Hispanic male walk up to Gomez's car while looking back and forth, with his head "on a swivel." The man had a short conversation with Gomez and then got into the passenger seat. Before the car door closed, Detective Koenig saw the man remove money from his pants pocket. Based on the man's actions and the location, Detective Koenig believed a drug transaction was about to occur. When the other officers arrived, Gomez and Ramirez were ordered out of the car. Gomez was told of his traffic violation and then admitted he was subject to parole search. Detective Koenig's testimony was undisputed at the preliminary hearing.

Based on the totality of the circumstances, Koenig and the other officers were justified in conducting an investigative detention; they had specific, and articulable facts which would cause a reasonable person to suspect that Gomez was involved in a drug transaction. Detective Koenig's testimony showed: Gomez was sitting in a parking lot in an area known for drug sales; he was approached by Ramirez, who was looking around

furtively as he walked towards Gomez's car; and after a brief discussion, Ramirez entered Gomez's car while pulling out money. "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his [or her] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . ." (*In re Tony C.* (1978) 21 Cal.3d 888, 894.)

The case law cited by Gomez does not compel a contrary conclusion. In each of the cases relied upon by Gomez, it was held that mere presence in a high crime area *or* an exchange of money *or* avoidance of police was insufficient to show reasonable suspicion. (*People v. Garry* (2007) 156 Cal.App.4th 1100 [standing next to a parked car late at night]; *People v. Aldridge* (1984) 35 Cal.3d 473, 479 [avoiding police in an area with continuous drug transactions].) For example, in *Jones*, *supra,* 228 Cal.App.3d at page 519, the grant of a motion to suppress was affirmed on appeal. The Court of Appeal held that the detention was illegal because the mere fact that the defendant received money from another person in an area known for drug activity did not justify the detention. (*Id.* at p. 524.) *Jones* is distinguishable. In *Jones,* there was no furtive behavior, including waiting in a parked car or being approached by an individual looking from side to side. These distinguishable circumstances, when added to the fact that Gomez was in an area where drug sales were common and that Ramirez was pulling money out of his pocket as he got into the car, demonstrate reasonable suspicion existed to support a detention here.

## DISPOSITION

The judgment is conditionally reversed and remanded. The trial court shall conduct an in camera review for discoverable material in the arresting officers' personnel files as specified in this opinion. If the trial court's inspection reveals no relevant information, the trial court must reinstate the judgment of conviction and sentence. If the inspection reveals relevant information, the trial court must order disclosure, allow Gomez an opportunity to demonstrate prejudice, and order a new trial if

there is a reasonable probability the outcome would have been different had the information been disclosed.  In all other respects, the judgment is affirmed.


                                        BIGELOW, P. J.

We concur:


        RUBIN, J.


        GRIMES, J.